**AUTOMATED SYSTEMS, INC.,**
Respondent,

v.

**NATIONAL INDEMNITY COMPANY,**
et al., Appellants,

**David Aronson and John G. B. Allen, individually and d.b.a. Insurance Service Associates, Inc., Respondents.**

No. 47559.

Supreme Court of Minnesota.

Aug. 11, 1978.

Schermer, Schwappach, Borkon & Ramstead and Steven C. Eggimann, Minneapolis, for appellants.

Robert W. Gislason and James T. Martin, Edina, for Automated Systems.

Jerome D. Truhn, Minneapolis, for Aronson et al.

Heard before ROGOSHESKE, PETERSON, and WAHL, JJ.

WAHL, Justice.

Action by plaintiff, Automated Systems, Inc., the assignee of the insured, to recover an unearned insurance premium allegedly due upon cancellation of an automobile fleet policy by defendant, National Indemnity Company.

On November 8, 1976, after a jury trial, the Hennepin County District Court entered findings of fact, conclusions of law, and order for judgment in favor of plaintiff, Automated Systems.[1] Defendant's alternative motion for judgment notwithstanding the verdict or new trial were denied by order of January 12, 1977, and judgment entered January 28, 1977. We affirm.

Defendant, National Indemnity Co. ("insurer"), is a foreign corporation licensed to sell insurance in the state of Minnesota. Policies are sold through Northern States Agency,[2] the exclusive managing general agency in the state ("managing general agency"), which in turn relies upon subagents and brokers, such as Insurance Service Associates, Inc. ("broker"), who actually contact the public. Automated Systems, Inc. ("finance company") is an independent company whose business included financing annual insurance premiums for individuals and corporations.

Rick Brown ("insured") contacted John Allen of Insurance Service Associates in the fall of 1971 to obtain insurance for Brown's rental automobile fleet. Due to the risk involved, the broker could arrange coverage only with National Indemnity. Allen then contacted the finance company to secure financing of the $4,336 insurance premium

for Brown. The company agreed to finance the premium, Brown signed the financing agreement, and the finance company remitted the insurance premium to the broker.

At the time for renewal of the policy in October 1972, general premium increases and a larger rental automobile fleet required a $7,160 policy premium. Although all parties were generally willing to continue the existing financing arrangement, the financing company was concerned about the broker's delay in returning an unearned premium of about $5,000 in another account.

The broker's financial condition was "shaky" at this time, and the broker wanted to expedite the premium to secure the 10 percent commission. After negotiation between Richard Potter, president of the finance company, and John Allen, they agreed to offset the accounts. The finance company tendered a "net check" for $1,772.09.

The broker failed to remit any part of the premium to the insurer before becoming insolvent, and the policy was cancelled for nonpayment of premium, effective January 1, 1973. The finance company, assignee of the insured under the terms of the financing agreement, claims credit for the full $7,160 premium amount. The insurer admits liability only for the $1,772.09 actually tendered by the finance company, less the $1,694 earned premium for October-December 1972. The issue thus raised for our consideration is whether, in light of the course of dealing and commercial practices of the parties, a jury could find that the offset of existing accounts between the broker and the finance company constituted the collection of an insurance premium, for which the insurer would be held responsible under Minn.St. 72A.03.

---

1. That trial was the second jury trial in this controversy. After the first trial and return of the special verdict, Judge Bruce C. Stone ordered judgment in favor of defendant, National Indemnity, on January 28, 1976. However, Judge Stone subsequently vacated that order on February 11, 1976, ordering a new trial because of errors of law, an ambiguity in the special verdict, and lack of a fair trial.

2. For purposes of the litigation, National Indemnity and its general agent, Northern States Agency, have been treated as one and the same defendant insurer.

The insurer contends that the cancellation of a prior obligation between the broker and the finance company was not a collection or securing of a premium. Minn. St. 72A.03,[3] which makes an insurer liable for the actions of its representative, is inapplicable, it argues, citing *Allen v. Metropolitan Life Ins. Co.*, 179 Minn. 545, 229 N.W. 879 (1930).

In *Allen v. Metropolitan Life, supra,* a life insurance agent agreed to accept as the initial premium payment the promise of the father of the insured to pay the first installment on a washing machine, which he sold to the agent. Notwithstanding the jury's verdict for plaintiff beneficiaries, the trial court ordered judgment for defendant insurer, finding that no contract of insurance had been effected. We affirmed the order, holding that an insurance agent has no implied authority to agree to apply an insurance premium in reduction or cancellation of his own indebtedness:

> "By statute, G.S. 1923 (1 Mason, 1927), § 3757, each agent negotiating insurance must be held 'the company's agent for the purpose of collecting or securing the premiums therefor.' But that implies no authority in the agent to accept payment in anything but money, unless he is authorized by the company to do so, as sometimes is the case with premium notes. He is not authorized to accept washing machines or other merchandise nor to agree that the premium or any part of it shall be applied on his own debt. No express authority of that kind is claimed. There can be no other, for '*it is an elementary principle, applicable alike to all kinds of agency, that whatever an agent does can be done only in the way usual in the line of business in which he is acting.* * * *'" (Emphasis added.) 179 Minn. 547, 229 N.W. 880.

It is clear from the circumstances of the case and the language of the opinion that our rejection of the "implied authority" argument was based upon the demonstrated commercial practices of the time; no reasonable jury could conclude that the manner of payment was actually or apparently authorized by the insurer. Commercial practices and the range of reasonable expectations are not permanently fixed, however, but can change with time or circumstances.

Other jurisdictions have recognized this fact. In *Hutcheson & Co. v. Providence-Washington Ins. Co.*, 341 S.W.2d 142 (Mo. App.1960), while following precedent[4] to hold that a credit applied to the insurance agent's personal account at the plaintiff furniture store did not constitute a payment of the fire insurance premium, the court recognized that a contrary result would be possible in a proper case, adding:

> " * * * And it should be noted that there was not shown any agreement, course of conduct and accounting or arrangement whereby the principal, took the agent for the debt; nor was it shown that the agent was charged upon the books of the insurer as personally owing the premium or 'nets' to the company." 341 S.W.2d 145.

Just such commercial practices were demonstrated in the instant case. The managers of the managing general agency and the broker testified in detail regarding the "net accounts" billing between the insurer and the managing general agency and between the managing general agency and the brokers, whereby monthly statements required only payment of a net balance of total premiums due less commissions and returned unearned premium. Client premium checks were made payable to the broker, premiums were not segregated from

---

3. Minn. St. 72A.03, states: "Every insurance agent who acts for another in negotiating a contract of insurance by an insurance company shall be held to be the company's agent for the purpose of collecting or securing the premiums therefor, whatever conditions or stipulations may be contained in the contract or policy. * * * *"

4. *Fernan v. Prudential Ins. Co. of America,* 162 S.W.2d 281 (Mo.App.1942); *Kahn v. Philadelphia Fire & Marine Ins. Co.,* 108 S.W.2d 457 (Mo.App.1937); *Gibson v. Texas Prudential Ins. Co.,* 229 Mo.App. 867, 86 S.W.2d 400 (1935).

the broker's general business funds, and the managing general agency looked only to the broker for satisfaction of the monthly accounts.

With these established practices as background, the issue of the acceptability of the "net check" premium payment becomes a factual question regarding the broker's apparent authority.[5]

The scope of an insurance representative's apparent authority to act on behalf of his company is an issue of fact to be determined by the evidence. *Morrison v. Swenson,* 274 Minn. 127, 136, 142 N.W.2d 640, 646 (1966). Several factors may be considered:

"* * * Such circumstances may be arrived at by the following inquiries: (1) Was the broker at the time of effecting the insurance actually or ostensibly connected with the insurer and employed by it, or was he acting independently of any employment by the company? (2) From whom did the broker's express or implied authority to do the act in question originally proceed? (3) Was the act one which the broker was expressly authorized to do, or was it a usual and necessary means to accomplish the execution of the authority conferred? (4) Was the act done independently of the original employment, and if so, for whom, or at whose instance? (5) Which party could the broker hold directly responsible for his remuneration at the time the act in question was done? (6) Was there any limitation on the broker's ostensible authority, of which the person dealing with him was, or ought to have been, cognizant? (7)

Was there any ratification by the ostensible principal of the claimed authorized act?" *Ibid.*

See, *Pesina v. Juarez,* 288 Minn. 379, 181 N.W.2d 109 (1970); *Bellanca Aircraft Corp. v. Fireman's Fund Ins. Co.,* 353 F.Supp. 929 (D. Minn. 1973).

*Travelers, Gude,* and *Fredman,* cited by appellant in challenging the broker's apparent authority, were distinguished in *Morrison v. Swenson, supra:*

"Appellant relies mainly on three cases, namely, *Gude v. Exchange Fire Ins. Co.,* 53 Minn. 220, 54 N.W. 1117; *Fredman v. Consolidated Fire & Marine Ins. Co.,* 104 Minn. 76, 116 N.W. 221; and *Travelers Ind. Co. v. National Ind. Co.* (8 Cir.) 292 F.(2d) 214. All of these cases are distinguishable from that now before us. In *Gude* the decision clearly emphasizes the fact that there was no connection between the defendant company and the alleged broker. This is not true here. In this case Umhoefer had many direct dealings with the defendant company and his name appeared on all of the communications between the company and the insured. In *Fredman* we pointed out that the insured could not under the facts in that case have understood the alleged agent to be the representative of the insurer. In *Travelers* the same is true, that there was nothing in the evidence that could or should have led the insured to believe the broker involved was the agent of the insurer." 274 Minn. 136, 142 N.W.2d 646.

Facts supporting the broker's representative status were available here. The broker

---

5. We do not feel that the existence of a third party, the finance company, compels more intricate analysis of the facts of this case.

The three cases involving an insurance premium financing company's claim for premiums withheld by the insurance representative do not purport to establish the legal relationships of the parties. *National Premium Budget Pl. Corp. v. LaSalle Cas. Co.,* 81 Ill.App.2d 466, 225 N.E.2d 400 (1967), and *Budget Premium Co. v. Inter-Insurance Exch.,* 55 Ill.App.2d 277, 204 N.E.2d 310 (1965), held only that the finance company's practice of remitting premiums to the local insurance representative violated the

terms of the financing notice or the insurer's express directive which designated a different payee. On those facts, the finance company was responsible for the representative's failure to forward. *National Prem. Budget Pl. Corp. v. Siegel Agency, Inc.,* 43 Mich.App. 29, 204 N.W.2d 30 (1972), held that the course of conduct between the parties precluded the insurer from raising the misidentification defense. Absent demonstration of further facts, we see no reason why the finance company cannot stand in the shoes of the insured for purposes of our analysis, as it does for purposes of payment to the insurer.

dealt directly with the insurer regional managing agency, pursuant to a verbal agreement. The insurer depended on such subagents and brokers to deal with the general public, supplied insurance application forms, and relied on its representatives to collect premiums. More particularly, the broker received authority to make the Brown coverage effective upon completion of the application, rather than physical delivery of the policy; and payment to the broker by the finance company was the procedure followed, without objection or difficulty, for the 1971–72 period.

Moreover, there were facts indicating that the broker had apparent authority to accept premium payments in the manner agreed to by the finance company. The finance company was fully aware of the net accounts billing procedure discussed above; the bulk of its business consisted of supplying sophisticated accounting and data processing services to insurance companies. It had settled multiple accounts with single checks in prior dealings with insurance agents and, in this instance, neither the finance company nor the broker anticipated further payment on the Brown account.

 The following questions were propounded to the jury at the conclusion of the evidence:

"1. Did the transaction which occurred on or about October 13, 1972 in the offices of Automated Systems, Inc., result in payment in the full renewal premium of Rick Brown's account?"

The jury answered, "Yes."

"2. Did Automated Systems know, or in the exercise of reasonable care, should they have known that Insurance Service Associates, Inc., would not forward the renewal premium to Northern States Agency?

The jury answered, "No."

"3. What damages, if any, did Automated Systems sustain?"

The jury answered, "$5,000."

In connection with the questions, the trial court instructed the jury on principles of agency. While the interrogatory does not specifically request a determination of "apparent authority," it was so interpreted by the court:

"The testimony indicated that the tendering of funds to ISA did take place. By answering the above-stated question in the affirmative, the jury determined an agency relationship existed between ISA and NIC, relying upon payment to NIC by ISA. The Court shall not invade the province of the jury with regard to this issue nor disturb its findings. The issue of agency as between ISA and the insurer or the insured, properly reserved for jury determination, has been so determined herein."

The judge has authority to liberally construe special verdicts to determine the jury's intention. *Chevalier v. Rogers,* 230 Minn. 540, 41 N.W.2d 872 (1950). Moreover, failure to demand submission of an issue of fact to the jury waives objection to the trial court's authority to make such findings. Rule 49.01, Rules of Civil Procedure.

■ There does not seem to be any good reason why the finance company and the broker, who dealt with each other in numerous such arrangements,[6] could not adopt the same net account relationship for premium payments. The credit on account is entitled to the same statutory guarantee under Minn. St. 72A.03 that a circuitous exchange of cash or checks would receive. See, *Transportation Ins. Co. v. David,* 324 F.2d 696 (1 Cir. 1963).

Affirmed.

TODD, J., took no part in the consideration or decision of this case.

---

6. On insolvency, the broker owed the finance company a total of $23,000 in unearned premiums.