MARKEL SERVICE INSURANCE AGENCY, INC. *vs.* TIFCO, INC.

Middlesex. September 12, 1988. — November 16, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & LYNCH, JJ.

*Contract*, Parties. *Broker*, Insurance. *Insurance*, Broker. *Agency*, What constitutes, Scope of authority. *Statute*, Construction.

In an action by a general agent for a number of insurance underwriters against a premium finance agency to recover for losses represented by premiums financed by the defendant on premium financing agreements generated by a certain insurance broker, which the defendant remitted to the broker but which the plaintiff never received due to the fraudulent conduct of the broker, the plaintiff was not entitled to recover on its claim that it was a third-party beneficiary of the premium financing agreements between the defendant and the insureds where, since it was clear from the judge's findings both that the plaintiff was acting in the transactions as the insurer and that the broker obtained and finally settled the terms and conditions of the policy with the insurer, it followed that the broker was a "negotiating broker" within the meaning of G. L. c. 175, § 169, and therefore that the defendant's payment to the broker was the equivalent of payment to the plaintiff under § 169; and where, since § 169 was designed to protect insureds, that purpose would be clearly served by affording to the defendant, a premium finance agency who paid the premiums on behalf of the insureds, the protection of § 169. [405-408]

CIVIL ACTION commenced in the Superior Court Department on August 10, 1982.

The case was heard by *Charles R. Alberti*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Paul R. Gupta* (*Thomas Paul Gorman* with him) for the defendant.

*James E. Grumbach* (*Hunter O'Hanian* with him) for the plaintiff.

LYNCH, J. The plaintiff, Markel Service Insurance Agency, Inc. (Markel),[1] filed suit against Tifco, Inc. (Tifco), and John D. Ryan, doing business as John D. Ryan Insurance Agency (Ryan), to recover for losses caused by Ryan's fraudulent conduct. Markel serves as the general agent for a number of insurance underwriters, while Tifco finances insurance premiums. Ryan, now bankrupt and not a party to this appeal, was an insurance broker who engaged in a fraudulent course of conduct that resulted in substantial economic losses to both Markel and Tifco.

Markel sought to recover, as a third-party beneficiary, the amount of the premiums financed by Tifco and paid to Ryan on the account of Markel's insureds. Markel also seeks to hold Tifco liable for Ryan's fraud on theories of agency, negligent supervision, and violations of G. L. c. 93A (1986 ed.).

Tifco defended on the theories that Markel put Ryan in a position to commit fraud by failing to supervise him, by the intentional and negligent misrepresentation of Ryan's credit worthiness, and by aiding and abetting fraud. Tifco also counterclaims based on similar theories and violation of G. L. c. 93A. In addition Tifco claims that payment was made to Ryan as the insurer's agent.

After a jury-waived trial, a judge in the Superior Court found in favor of Markel on its third-party beneficiary claim and entered damages in the amount of $181,463.39, which represents the amount of premiums financed by Tifco on premium financing agreements (PFAs) generated by Ryan, which Tifco remitted to Ryan, and which Markel never received.[2] The judge also found in favor of Markel on Tifco's counterclaims. Tifco appealed and we granted Tifco's application for direct appellate review. We reverse the judgment in favor of Markel and remand the case to the Superior Court for the entry of judgment for Tifco.

---

[1] Markel Service Insurance Agency, Inc., and Markel Service, Inc., are separate but related entities and are referred to collectively as "Markel."

[2] The judge found in favor of Tifco on Markel's agency-fraud, negligence, and G. L. c. 93A claims. Markel does not appeal those rulings.

The judge found the following facts. Pursuant to a brokerage agreement with Markel, Ryan obtained individual and commercial insurance for his customers by providing Markel with underwriting information and relaying back to the customer the quote for the proposed coverage. If the customer elected to accept the coverage, Ryan booked the business with Markel, who placed the policy with one of the underwriters for whom it was authorized to bind coverage.

Under the brokerage agreement, Ryan was "primarily liable to Markel for the full amount of the premium" and Markel billed Ryan on a monthly basis for the premium due from the preceding month's business.

Those insureds who wished to finance their premium obligations with Tifco executed a PFA provided to Ryan by Tifco. The PFAs provided that Tifco would pay the premium to the designated insurance company and the insured agreed to repay Tifco the amount financed in amortized monthly instalments which included a finance charge. The PFAs also assigned to Tifco as security all unearned and returned premiums and the PFAs gave Tifco a power of attorney to cancel the coverage in the event of an insured's default.

Tifco paid Ryan, not Markel, the full amount of the financed premium knowing that Ryan did not immediately remit the premiums to Markel. After paying Ryan, Tifco sent an advice of financed premium to the appropriate underwriters, Markel, and Ryan. These advices notified them that the new policy was being financed and that Tifco was the assignee of unearned and returned premiums. Tifco's advices also requested an acknowledgment of receipt. However, the judge found "Tifco procedures for monitoring receipt of acknowledged advices . . . were imperfect: of the accounts in question, Tifco could produce few Markel acknowledged Advices."

On numerous occasions between 1980 and 1982, Markel directed Tifco to pay financed premiums directly to it rather than Ryan.[3] Tifco refused to pay Markel directly and notified

[3] Markel would send Tifco a form letter which acknowledged Tifco's premium financing. The letters contained the following directions: "If we are to protect your company's interest and to accept the terms of your finance agreement, we request premiums be paid directly to us."

Markel of its position that payment to Ryan constituted payment to the insurer.

The financial losses at issue in this case resulted from Ryan's misconduct.[4] From 1980, to August, 1982, Anthony Ciulla managed Markel's office in Belmont and was responsible for Ryan's accounts. Throughout the Markel-Ryan relationship, Ryan was delinquent in paying his outstanding premium obligations, and his monthly delinquency ran anywhere from $20,000 to $70,000.

During 1981, the Markel home office notified Ciulla of its concern regarding Ryan's continued delinquency. In December, 1981, Markel's credit manager instructed Ciulla not to "accept promises" from Ryan since two checks from Ryan were returned for insufficient funds. Because Ryan failed to reduce his delinquent balance, the credit manager wired Ciulla on January 22, 1982, and directed him to no longer bind Ryan business on a credit basis.

In January, 1982, Tifco also encountered a problem with Ryan,[5] and temporarily suspended Ryan's premium finance activities on its behalf and investigated his credit worthiness. During the investigation, Tifco's vice president in charge of credit talked to Ciulla. The judge found that, during the conversation Ciulla told him that Ryan "is a good class of business," "at times runs a little slow," "is presently OK," and "is a very honest and sincere person." The judge also found that Ciulla made those statements to Tifco's vice president "only

---

[4] The judge found that, "[d]uring the period 1978-1982, Ryan executed a scheme by which he would: (a) forge insured's names on the PFAs, or fraudulently induce insureds to execute PFAs, or otherwise misappropriate funds; (b) collect the deposit premium from the insured; (c) finance the premium balance with Tifco; (d) receive the financed amount from Tifco; (e) fail to pay the premium payments to the insurer, or fail, on cancellation of policies, to return funds to Tifco. Ryan also misrepresented the status of insurance coverage and premium finance agreements."

[5] An officer of the Andover Insurance Company notified Tifco that he had not authorized his signature on a verification of coverage form submitted by Tifco to Ryan.

a matter of days after the home office instructed him not to bind further Ryan business on credit." [6]

In March, 1982, Tifco sought a professional credit report on Ryan after a check to Tifco was returned for insufficient funds.[7] After receiving the report, Tifco allowed Ryan to continue transacting PFAs on its behalf until June, 1982, when Tifco discovered that Ryan had submitted an unauthorized PFA.

Markel asserts that it is a third-party beneficiary of the PFAs between Tifco and the insureds, and is therefore entitled to premiums Tifco paid to Ryan instead of Markel.[8] Markel argued, and the judge found, that Tifco and the insureds "contemplated payment to Markel of sums advanced under the note in order to satisfy the insured's premium obligation," and thus Markel was an intended creditor beneficiary of the PFAs. The judge also found that Tifco's payment to Ryan instead of Markel constituted a breach Markel could enforce.

We have recognized the right of a third party to enforce a contractual provision in its favor where that party is an intended beneficiary of the contract. *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 194 (1982). *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 542-546 (1979). In *Rae*, this court applied the rule set forth in the Restatement (Second) of Contracts § 302 (1981) "with regard to both creditor and other types of intended beneficiaries." *Id.* at 195. Under this doctrine the parties' intent determines whether a third party is an incidental or intended beneficiary. See *id.* at 195 & n.3; *Choate, Hall & Stewart* v.

---

[6] The judge also found that "Ciulla was unaware of Ryan's improprieties. Ciulla sponsored Ryan as a Markel producer only because Ryan generated a substantial volume of business. Ciulla was motivated solely by the desire to increase the amount of business emanating from the Belmont office and to that end he downplayed the risks presented by Ryan's continuing delinquency."

[7] Over-all, the report was favorable and contained the following statement regarding the credit check with Markel: "Source indicated this has been a very very profitable book of business and payments are made as agreed and are current to date."

[8] Markel is designated as the insurer on the PFAs in question.

*SCA Servs., Inc., supra* at 543-544; Restatement (Second) of Contracts § 302 (1981).

Tifco maintains, however, that the intended beneficiary rule does not apply because its payment to Ryan constituted payment to Markel under G. L. c. 175, § 169 (1986 ed.). Markel concedes that, by virtue of G. L. c. 175, § 169, it would be charged with payment by the individual policyholders to either Ryan or Tifco,[9] but argues that the statute does not provide the same protection to Tifco.

The judge concluded that Tifco's payment to Ryan did not constitute payment to Markel pursuant to G. L. c. 175, § 169, because Ryan was not a "negotiating broker" within the meaning of the statute. In so ruling, the judge relied upon our holdings in *Hudson* v. *Massachusetts Property Ins. Underwriting Ass'n*, 386 Mass. 450 (1982), and *Morton Furniture Co.* v. *Dubuque Fire & Marine Ins. Co.*, 287 Mass. 170 (1934). We conclude that Ryan was a "negotiating broker" for purposes of G. L. c. 175, § 169.

As the findings disclose, Markel was the general agent of a number of insurance underwriters with authority to bind these underwriters to contracts of insurance. When Ryan's customers elected to accept the coverage and rates quoted by Markel, Ryan booked the business with Markel and Markel bound the business without a down payment on the policy. An examination of the PFAs discloses that Markel is described as the insurer. It is apparent, therefore, that Markel as general agent with binding authority was acting in the stead of the underwrit-

---

[9] General Laws c. 175, § 169 (1986 ed.), provides: "An insurance agent or broker acting for a person other than himself in negotiating, continuing or renewing any policy of insurance or any annuity or pure endowment contract shall, for the purpose of receiving any premium therefor, be held to be the agent of the company, whatever conditions or stipulations may be inserted in the policy or contract." This section protects insureds who reasonably believe that the broker who negotiates, continues, or renews insurance policies on their behalf is authorized to accept payment on behalf of the insurance company. *Ritson* v. *Atlas Assurance Co.*, 279 Mass. 385, 392 (1932) ("It seems plain that by its true interpretation it makes the payment of a premium to a broker payment to the company no matter what condition or stipulation may be contained in the contract or policy to the contrary").

ers. Ryan was acting for the insureds. Thus the discussions which finally settled the terms and conditions of the policy were conducted by Markel on behalf of the underwriters and Ryan on behalf of the insureds. In these circumstances the judge's conclusion that Ryan was not a negotiating broker was error as a matter of law. Since it is clear from the judge's findings both that Markel was acting in these transactions as the insurer and that Ryan was "the broker who obtained and finally settled the terms and conditions of the policy with the insurer," [10] *Morton Furniture Co.* v. *Dubuque Fire & Marine Ins. Co., supra* at 175, it follows that Ryan was a negotiating broker within the meaning of G. L. c. 175, § 169, and therefore that payment to him was the equivalent of payment to the company.

Our decisions in *Hudson* v. *Massachusetts Property Ins. Underwriting Ass'n, supra,* and *Morton Furniture Co., supra,* do not lead to a different conclusion. In *Hudson,* we held that the policy took effect when the Massachusetts Property Insurance Underwriting Association (MPIUA) received the premium, and we noted the unique statutory requirements that precluded the issuance of any insurance until certain preconditions had been met by the person seeking insurance and certain action taken by the insurer. The MPIUA then was neither the agent of the insurer nor, because of the unique statutory requirements, acting as the insurer itself. Thus we held that it was the MPIUA, not the broker, "who settles the terms and conditions of the policy with the companies who provide coverage." [11] *Id.* at 458. In *Morton Furniture Co., supra,* payment was made to a broker, who had no contact with the company or its general agent and was unknown to both.

---

[10] It would follow from the judge's conclusion that premium payments by individual insureds to Ryan would also be outside § 169's protection. Such an interpretation would frustrate § 169's protective purpose and in effect make it a nullity. Also, we can see no reason to distinguish between individuals and premium finance agencies when defining "negotiating broker."

[11] In *Hudson, supra* at 459, we also noted the significance of the statutory scheme: "Prior to the enactment of the Urban Property and Protection Act, owners of urban property often could not obtain insurance. Thus, they did

Markel also argues that Tifco's payments are not protected by § 169 because the statute was intended to protect insureds not premium finance agencies. Its reliance on *Carter* v. *Empire Mut. Ins. Co.*, 6 Mass. App. Ct. 114 (1978), in support of this argument is misplaced. The Appeals Court's reasoning, that a finance company "is implicated in the process of selling insurance to the public," *id.* at 121, and is chargeable with receipt of premiums paid to its agent, does not lead to the conclusion that § 169 is inapplicable to payments by premium finance agencies.[12]

Neither does the language of G. L. c. 175, § 169, specifically or by implication limit the statute's protection. Settled principles of statutory construction dictate that we must construe § 169 in "light of the legislative objectives which were served by its enactment so as to effectuate the purpose of the framers." *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 757 (1975). In *Ritson* v. *Atlas Assurance Co.*, 279 Mass. 385, 392 (1932), we held that § 169 was designed to protect insureds by making brokers agents of the insurers for collecting premiums. That purpose is most clearly served by affording to Tifco, who paid the premiums on behalf of the insureds, § 169's protection. Thus we conclude that Tifco's payment to Ryan constituted payment to the insurer under G. L. c. 175, § 169.

---

not benefit from the protections afforded by G. L. c. 175, § 169. As a result of the Urban Property and Protection Act and G. L. c. 175C, insurance for urban property has become more readily available. . . . To require insurance obtained through MPIUA to become effective when the broker receives payment of the premium, rather than at the time MPIUA receives payment, might undermine this program." (Citation omitted.)

[12] The Appeals Court concluded that a finance agency has the same general duty as an insurance company to apply premium overpayments to avoid policy forfeiture. *Carter* v. *Empire Mut. Ins. Co.*, *supra* at 121. The Appeals Court's reasoning is entirely consistent with the highly regulated area of premium financing. See, e.g., G. L. c. 255A (1986 ed.). See also G. L. c. 175, § 162B (1986 ed.) ("For the purposes of financing insurance premiums and the subsequent sale or other negotiation of any such note or instrument to a third party, insurance agents and brokers shall be considered to be sellers of insurance").

In light of our holding that Tifco's payment to Ryan was valid payment to the insurer under G. L. c. 175, § 169, it is unnecessary to address any remaining issues raised on appeal. The judgment in favor of Markel on its third-party beneficiary claim is reversed and the case is remanded to the Superior Court for entry of a judgment for Tifco.

*So ordered.*