LUMBERMEN'S UNDERWRITING
ALLIANCE, Appellant,

v.

TIFCO, INC., Respondent,

Mid–Continent Agencies, Inc.,
Defendant,

Dana L. Marcelius, et al., Robert S.
Stevenson, Steven L. Phelps,
Respondents.

No. C2–90–1698.

Court of Appeals of Minnesota.

Jan. 22, 1991.

Review Denied April 1, 1991.

Charles E. Gillin, Thomas A. Harder, Jardine, Logan & O'Brien, St. Paul, for Lumbermen's Underwriting Alliance.

Patrick J. O'Connor, Jr., Hart, Bruner & O'Brien, P.A., Minneapolis, for Tifco, Inc.

Lewis A. Remele, Jr., Michael A. Klutho, Bassford, Heckt, Lockhart, Truesdell & Briggs, P.A., Minneapolis, for Dana L. Marcelius, et al.

Michael G. Singer, Peterson & Singer Law Office, Minneapolis, for Robert S. Stevenson.

Michael H. Daub, Yost, Daub & Sanford, Minneapolis, for Steven L. Phelps.

Considered and decided by PARKER, P.J., and FORSBERG and FLEMING,* JJ.

## OPINION

### WILLIAM J. FLEMING, Judge.

Appellant Lumbermen's Underwriting Alliance (LUA) brought this action against respondent Tifco, Inc. (Tifco); defendant Mid–Continent Agencies, Inc. (MCA); respondents Dana L. Marcelius, Dennis L. Edling, Daniel A. Hovanes, Steven L. Phelps, and Robert S. Stevenson. This appeal is from a grant of partial summary judgment dismissing LUA's claims against Tifco. In accordance with Minn.R.Civ.P. 54.02, the trial court determined there was no just reason for delay of entry of judgment and directed entry of judgment.

On appeal, LUA argues the trial court erred in granting summary judgment and abused its discretion in denying its requests to amend its complaint. We agree, and reverse and remand.

## FACTS

LUA is an insurance company authorized to write worker's compensation insurance in Minnesota. Tifco is an insurance premium finance company doing business in Minnesota. MCA was an insurance agency doing business in Minnesota until it terminated business activity on or about May 30, 1987. Marcelius, Edling, Hovanes, Phelps, and Stevenson were insurance agents, officers, employees, or principals of MCA.

Prior to the events giving rise to this litigation, Tifco and MCA had entered into a "Memorandum of Understanding" in which MCA agreed to sell, market and administer Tifco finance agreements. In exchange, MCA was to receive a fee based on the value of the finance agreement.

MCA also had draft writing authority on Tifco's checking account. Once it sold a finance agreement to an insured, MCA would generally prepare a draft payable to itself. Tifco would confirm the existence of a policy and approve the draft, after which MCA would deposit the draft into its own account. By doing so before the premiums were due to the insurance company, MCA obtained the time value of the money or the "float."

In late 1986, MCA began to experience financial difficulties. It was unable to collect a number of accounts receivable, lost a number of accounts, and its authority was cancelled by some of its primary carriers. Tifco admits it received telephone calls from other insurance companies regarding MCA's financial stability, which raised a concern in Tifco regarding MCA's ability to pay premiums to insurance companies. MCA also informed Tifco it was having financial difficulties and could not make some payments. Nevertheless, Tifco did not investigate further or otherwise change its dealings with MCA.

In early 1987, MCA approached LUA to underwrite worker's compensation policies for two of its customers, Advance Packaging, Inc. (Advance) and Medallion Kitchens (Medallion). MCA had never placed a policy with LUA before.

LUA informed MCA it was a direct writer of insurance, employed no agents, and under no circumstances would it pay a commission to MCA. MCA consented, and indicated it was acting as a "risk management consultant" on behalf of the insureds and would earn a profit from the insureds.

LUA agreed to consider writing the policies. After reviewing Advance's business, LUA informed MCA it could provide coverage at a premium quote of approximately $144,000. LUA agreed to bind coverage for Advance on March 15, 1987. LUA similarly reviewed Medallion's business, and informed MCA it would provide coverage

---

* Retired district court judge, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

for a premium of $244,000. LUA agreed to bind coverage on the Medallion policy effective May 1, 1987. In both cases, LUA informed MCA the premiums would not be due until the policies were issued and received. LUA estimated the statements would not be issued until approximately 45 days after coverage was bound.

MCA recommended to both Advance and Medallion that they finance their premiums through Tifco. In so doing, however, MCA failed to inform either Advance or Medallion that LUA offered a 12–month interest-free financing plan. Advance and Medallion claim that had they been informed, they would have elected to finance with LUA.

Advance and Medallion both entered into finance agreements with Tifco. Under the terms of those agreements, Tifco agreed to finance approximately 80%, or $200,080 of Medallion's premium and $118,785 of Advance's premium, with Medallion and Advance paying the remaining 20%, or $43,920 and $26,160 respectively. Immediately after the policies became effective, MCA drew drafts payable to itself for the full amount of the premiums financed by Tifco. Tifco approved the drafts. MCA then received the remaining balance of the premiums from Advance and Medallion. While LUA was aware that the premiums were being financed through Tifco, it claims it was not aware MCA had already received the funds from both Tifco and the insureds.

LUA did not send an invoice to MCA for the Advance policy until May 26, 1987, with the premium due June 10, 1987. With respect to the Medallion policy, a bill was never sent to MCA because MCA had already ceased operations before LUA prepared an invoice for the premium. The record contains an invoice dated July 23, 1987 that was sent to Medallion for its portion of the premium.

MCA went out of business on or about May 30, 1987, well before the premiums were due on either policy. LUA received none of the Tifco funds. When claims were subsequently made by Advance and Medallion, LUA initially refused to extend coverage.

LUA eventually changed its position, however, and agreed to extend coverage after it was contacted by the Minnesota Department of Commerce. LUA then brought this action against Tifco, MCA, and individual MCA officers to recover the premiums on the Advance and Medallion policies. In particular, the complaint alleges that MCA operated as Tifco's agent, and that Tifco negligently selected, directed, and supervised MCA.

Tifco filed a separate answer, counterclaim, and cross-claim. Apparently, upon recalculation of Advance's premium, LUA determined the premium was $87,000, instead of the original quoted premium of $144,945. Advance thereafter made no further installment payments to Tifco on its finance agreement. Tifco's counterclaim seeks reimbursement of $61,608.04 in unearned premiums, which it claims it paid to LUA through MCA.

LUA thereafter moved to amend its complaint to include allegations of joint venture and joint enterprise against Tifco. The trial court denied the motion.

Tifco brought a motion for summary judgment. LUA opposed the motion, and moved for a second amendment of the complaint to allege a third-party beneficiary theory of liability against Tifco. The trial court denied LUA's motion to amend its complaint, but granted Tifco's motion for summary judgment. In so doing, the court determined that Minn.Stat. § 72A.03 (1986) governed, and that MCA was acting as the agent of LUA when it collected the premiums from Advance, Medallion, and Tifco.

## ISSUES

1. Did the trial court err in granting summary judgment?

2. Did the trial court abuse its discretion in denying LUA's requests to amend its complaint?

## ANALYSIS

### I

Summary judgment is appropriate where the moving party has clearly sustained its

burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Minn.R. Civ.P. 56.03. In ruling on a summary judgment motion, the court must take the view of the evidence most favorable to the nonmoving party. *Vacura v. Haar's Equipment, Inc.,* 364 N.W.2d 387, 391 (Minn. 1985).

■ In the memorandum attached to its order granting summary judgment, the trial court stated: "When MCA proceeded to collect the premiums from * * * Tifco, it was acting as the agent of LUA. LUA, then, can be held to be in receipt of those monies by virtue of MCA having received same." This conclusion is based on the trial court's interpretation of Minn.Stat. § 72A.03 (1986), which provides in pertinent part:

> Every insurance agent who acts for another in negotiating a contract of insurance by an insurance company shall be held to be the company's agent for the purpose of collecting or securing the premiums.

The predecessor to section 72A.03, Minn. Stat. § 72.05 (1965), was identical, with the exception that it applied to "[e]very insurance agent *or broker* who acts for another." (Emphasis added.) In 1967, section 72.05 was repealed and section 72A.03 was enacted without any reference to broker. *See* 1967 Minn. Laws, ch. 395, art. 12, §§ 3 and 40.

LUA argues the current version of the statute does not apply to brokers. We disagree. The operative language of § 72A.03 is "insurance agent *who acts for another* in negotiating a contract of insurance." Since a broker is simply an insurance agent who acts for an insured, section 72A.03 is broad enough to cover a broker. The statute clearly provides that on whomsoever's behalf the insurance agent acts, it will be deemed to be the insurer's agent for the purpose of collecting or securing the premiums. In addition, the supreme court has specifically applied the current version of section 72A.03 to a "broker." *See Automated Sys., Inc. v. National Indem. Co.,* 269 N.W.2d 749 (Minn.1978).

■ LUA next argues section 72A.03 has a limited purpose, and was not intended to protect premium finance companies like Tifco. Again, we must disagree. In *Automated Systems,* 269 N.W.2d at 752 n. 5, the supreme court stated "[a]bsent demonstration of further facts,[1] we see no reason why the finance company cannot stand in the shoes of the insured" for purposes of section 72A.03. *See also Markel Serv. Ins. Agency, Inc. v. Tifco, Inc.,* 403 Mass. 401, 408, 530 N.E.2d 340, 344 (1988) ("[W]e held that § 169 [Massachusetts' equivalent to § 72A.03] was designed to protect insureds by making brokers agents of the insurers for collecting premiums. That purpose is most clearly served by according to Tifco, who paid the premiums on behalf of the insureds, § 169's protection.")

While we believe section 72A.03 applies to brokers and may be used by premium finance companies, we do not believe that it automatically protects Tifco from liability in this case. The statute provides an agent may be acting as an agent for the insurer in collecting or securing a premium. This court has recognized section 72A.03 makes an insurance agent an agent of the insurer "only for a limited scope of activity: for the purpose of negotiating a contract of insurance and collecting premiums." *CUPAC, Inc. v. Daly Agency,* 414 N.W.2d 790, 792 (Minn.App.1987). A "separate and distinct transaction" may arise involving the financing of premiums in which the agent is acting as agent of the premium finance company. *See National Premium Budget Plan Corp. v. LaSalle Casualty Co.,* 81

---

1. In *Automated Systems,* 269 N.W.2d at 750, the broker's financial condition was described as "shaky." Other than the financing company's concern about the broker's delay in returning an unearned premium in another account, there was no evidence to suggest that the finance company was aware of the broker's financial condition. Here, LUA has alleged "further facts" which may prevent Tifco from enjoying the protection of the statute. As will be discussed, those facts include that when MCA executed and Tifco approved the drafts for the premiums, Tifco was fully aware of MCA's financial condition and the premiums were not yet due.

Ill.App.2d 466, 471, 225 N.E.2d 400, 403 (1967).

■ MCA's premium financing activities and premature collection of premiums may not be within the limited agency established by section 72A.03. LUA argues the loss in this case was caused not by MCA's collection of the premiums for it, but by MCA's collection of the premium finance monies from Tifco before they were due or owing to LUA. LUA further argues Tifco's decision to prepay the premiums and MCA's decision to collect those premiums is outside the scope of the agency created by section 72A.03. A fact issue exists as to whether MCA's actions were performed pursuant to its premium financing activities or its collection of premiums. If performed pursuant to its premium financing activities, then MCA may be considered Tifco's agent, if performed pursuant to its collection of premiums, then MCA was acting as LUA's agent under section 72A.03.

This interpretation of section 72A.03 is consistent with *Automated Systems*. In that case, the premium finance company did not automatically receive the protection of section 72A.03. The issue went to a jury to determine the scope of the broker's apparent authority. *Automated Systems*, 269 N.W.2d at 753. On appeal, the supreme court examined the "course of dealing and commercial practices of the parties" before it concluded that the broker was the insurer's agent under section 72A.03. *Automated Systems*, 269 N.W.2d at 750. Similarly, the course of dealing and commercial practices of the parties in this case should be examined to determine the scope of MCA's authority and whether MCA was acting within that authority when it executed the Tifco drafts and deposited them in its account.

Since we have determined that section 72A.03 does not automatically preclude finding Tifco liable, we need not address whether a separate cause of action in negligence exists. In other jurisdictions where the premium finance company is adjudged to have been negligent in the execution of its loan procedures thereby facilitating its loss, recovery against an insurer may be denied. *See, e.g., International Indem. Co. v. Bakco Acceptance, Inc.*, 172 Ga.App. 28, 31–33, 322 S.E.2d 78, 81–82 (1984) (premium finance company's policy of allowing agents to write drafts on its account made possible and perhaps facilitated agent's misappropriation of funds); *National Premium Budget Plan Corp. v. National Fire Ins. Co.*, 106 N.J.Super. 238, 243–46, 254 A.2d 819, 821–23 (premium finance company may be negligent for entrusting monies to agent under circumstances in which "suspicion might well have been aroused"), *cert. denied*, 54 N.J. 515, 257 A.2d 113 (1969). Tifco's contributory negligence, if any, may affect its ability to recover on its counterclaim against LUA for unearned premiums. Similarly, LUA's negligence with respect to its billing procedures, if any, may affect its recovery on its claim against Tifco.

## II

■ Minn.R.Civ.P. 15.01 provides "leave [to amend a pleading] shall be freely given when justice so requires." A trial court may deny such an amendment where prejudice may result to the opposing party or where such an amendment would serve no legal purpose. *See Pischke v. Kellen*, 384 N.W.2d 201, 204 (Minn.App.1986) (citing *Eisert v. Greenberg Roofing & Sheet Metal Co.*, 314 N.W.2d 226, 228 (Minn.1982)).

■ LUA filed two separate motions to amend its complaint. The first requested that it be allowed to add claims of joint enterprise and venture. The second requested addition of a third-party beneficiary theory of liability against Tifco. Since we have reversed the grant of summary judgment to Tifco and concluded a fact issue exists as to its liability, on remand LUA should be able to amend its complaint to include its additional claims. Tifco will not be prejudiced, and the claims present some degree of legal viability.

## DECISION

The trial court's grant of partial summary judgment to Tifco and its denials of LUA's requests to amend its complaint are reversed. The matter is remanded for fur-

ther proceedings in accordance with this decision.

Reversed and remanded.

FORSBERG, Judge, (dissenting):

I respectfully dissent. I believe MCA was "collecting or securing" premiums, within the meaning of Minn.Stat. § 72A.03 (1986), when it executed and deposited drafts from Tifco's account into its own account. I agree with the majority that there may have been two separate transactions: the first involving the financing activities between MCA and Tifco, and the second involving the collection of premiums between MCA and LUA. That first transaction, however, only involved MCA's activities in quoting, typing, and processing premium finance agreements, as set forth in the "Memorandum of Understanding." There is no evidence to suggest an agency relationship existed between Tifco and MCA with respect to MCA's collection of the premiums.

LUA was fully aware the premiums were being financed through Tifco. Under section 72A.03, MCA is deemed to be LUA's agent. Payment of the premiums to MCA thus constituted payment to its principal, LUA. LUA cannot assert it has not been paid and seek recovery of its loss from Tifco.

For these reasons, I would affirm the trial court's grant of summary judgment to Tifco.