SUPERIOR COURT 
 
 ZEMCAR INC. d/b/a GRIP MOBILITY CO. vs. UBER TECHNOLOGIES, INC.

 
 Docket:
 2484CV01525-BLS2
 
 
 Dates:
 January , 2025
 
 
 Present:
 Debra A. Squires-Lee
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT’S MOTION TO DISMISS
 
 

             Zemcar Inc. d/b/a Grip Mobility Co. (Grip) developed an audiovisual-recording technology to make rideshares safer. Uber Technologies, Inc. (Uber) worked with Grip to conduct a two-year pilot program to assess Grip’s technology for potential licensing or acquisition. The pilot was conducted in Brazil pursuant to Master Service Agreements, and other contracts, between Grip and Uber and Uber Do Brasil Technologia LTDA (Uber Brasil), a Brazilian limited liability company. During the pilot, Grip provided Uber with its intellectual property, confidential information, and know-how.
            After a successful pilot, Uber abandoned its relationship with Grip and, Grip alleges, issued its own in-ride audiovisual recording system that relied on and used Grip’s trade secret, confidential, and proprietary information. Grip filed this case alleging fraud (Count I); negligent misrepresentation (Count II); violation of G. L. c. 93A, §§ 2, 11 (Count III); conversion (Count IV); violation of the Massachusetts Trade Secrets Act (MUTSA or Act), G. L. c. 93, §§ 42-42G (Count V); and unjust enrichment (Count VI).
            Uber moves to dismiss arguing that the mandatory forum selection clauses in the various agreements requires suit in Brazil, and that Grip has failed to state claims for
 
                                                            -1-
 
relief. After hearing and review, and for the reasons stated below the Motion to Dismiss is ALLOWED as to one of Grip’s theories of misrepresentation but is otherwise DENIED.
BACKGROUND
            I recite the relevant facts asserted in the Complaint, “taking them as true for purposes of evaluating the motion to dismiss.” Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). I do not accept as true legal conclusions. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008). Further, I consider and address the contracts attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Some facts are reserved for discussion below.
            Parties. Grip was founded in 2015 with a goal of making rideshares safer. Grip invested significant resources into researching and developing rideshare solutions centered on in-ride audiovisual technology. Grip developed many solutions, including technology that delivered real time audiovisual recording from a rideshare driver’s smartphone without additional hardware and that broadcast ride information in real time from the driver’s phone to another device chosen by the rider. Grip’s solutions are reflected in technical specifications, test results, data compilations, engineering techniques, and other materials which Grip maintains as highly confidential and which Grip has protected from disclosure. Grip requires all its employees and contractors to execute non-disclosure agreements prohibiting disclosure of Grip’s technical and business information to any non-employee. Grip also requires certain employees to execute noncompete agreements and intellectual property assignment agreements.
            Uber is the market leader in the rideshare industry. Since at least 2019, Uber riders have experienced issues with ride safety including armed robbery, assault, and rape. Uber drivers also have suffered from threats, harassment, and assault. In Brazil,
 
                                                            -2-
 
forty app-based drivers were murdered in 2021. Therefore, safety is very important to Uber.
            Early Relationship. In the summer of 2019, Grip approached Uber to pitch its audiovisual capture technology.  Uber recognized that Grip’s solution could assist Uber. On May 21, 2019, Uber and Grip entered into a Mutual Non-Disclosure Agreement (2019 NDA). It contains a California choice of law provision.[1] In July 2019, Grip’s co-founders and senior executives met in San Francisco, with Uber’s Product Safety Manager and its Director of Business Development for Safety. Grip demonstrated its audiovisual capture technology and answered questions. After the meeting, it was clear to Grip’s executives that Uber had no preexisting technical know- how or capabilities regarding in-ride video-capture solutions. The next day, Uber contacted Grip and described Grip’s solution as an excellent safety application for Uber.
            On September 4, 2019, Uber’s Business Development Manager, Julia Rudge (Rudge), called Grip and asked for Grip’s technical information relating to Grip’s audiovisual capture solution. Grip provided Uber with confidential and proprietary technical information derived from its testing and analysis of its software solution in Android, iOS, and web technologies, developed before Grip first began discussions with Uber. The material shared with Uber included details about the operability of Grip’s technology and the configurable video parameters Grip developed for it including optimal data rate ranges for video uploading / streaming.
            Communications between Grip and Uber continued throughout September 2019. At Rudge’s request, Grip provided Uber with a driver login for the Zemcar application (app) that used Grip’s audiovisual recording technology. Grip explained the app’s
 
--------------------------------------------
 
[1]  The 2019 NDA states, “[t]his Agreement will be governed and construed in accordance with the laws of the State of California without regard to its conflict of laws provisions.”
 
                                                            -3-
 
functionality to Rudge during a Zoom call on September 13, 2019, and, on September 26, 2019, sent Rudge detailed step-by step instructions for testing the Zemcar app. Grip also provided optimized Android Package Kits (APKs) for its rider and driver apps which included, among other things, “executable files comprising the compiled code of Grip’s software application written for Android, including code related to many of Grip’s core capabilities and safety features.” Over the course of their relationship, Grip provided Uber with various iterations of Grip’s APKs.
            First Brazil Pilot Program and 2019 Contracts. After additional discussion, Uber decided to test Grip’s technology via a pilot partnership / program in São Paulo, Brazil. As of October 18, 2019, Grip and Uber Brasil entered into a Master Agreement for Services (2019 MSA) and Statement of Work (SOW) for Grip to “provide audio and video recording services as a pilot program to [Uber Brasil] by developing a standalone app for such purpose.” In the 2019 MSA, Grip’s counterparty is identified as “Uber Do Brasil Tecnologia LTDA, a limited liability company incorporated in accordance with Brazilian law, having an address” in São Paulo Brazil. However, the executive Summary to that MSA states:
This document summarizes the pilot partnership between Uber Technologies Inc. and Grip Mobility. Broadly, the goal of the partnership is for Grip Mobility to provide Uber with proprietary software aimed at increasing in-ride safety and security for Uber drivers and passengers.
The 2019 MSA contains a confidentiality provision governing the use and disclosure of confidential information including trade secrets and providing that such information was to be used only to perform obligations under the MSA. The 2019 MSA also contains the following choice of law and forum selection clause:
This Agreement shall be governed by and construed in accordance with the laws of Brazil without regard to its choice or conflict of laws provisions. The Parties hereby consents [sic] to the exclusive jurisdiction and venue in the courts of São
 
                                                            -4-
 
Paulo , Brazil.
Neither Uber nor any Uber Brasil “affiliate” is mentioned in the 2019 MSA. The 2019 SOW does not include a choice of law or forum selection clause.
            The first pilot, which centered on Grip’s standalone “Sentinel” app, was successful. On February 25, 2020, Uber invited one of Grip’s co-founders to participate in a public session for Uber’s global safety and security teams at Uber headquarters with a large audience. The session discussed rideshare safety and an explanation and overview of the pilots and Grip’s capabilities.
            Second Brazil Pilot Program and 2020 Contracts. Grip and Uber agreed to a second pilot to be conducted in Brazil. On September 4, 2020, Grip entered into a Non- Disclosure Agreement with Uber Brasil, this time identified as “a private legal entity . . . and its Affiliates” (2020 NDA) (emphasis added). The 2020 NDA contains a Brazilian choice of law and forum selection provision as well as an integration clause.[2]
            As of October 15, 2020, Grip and Uber Brasil entered into a second Master Services Agreement (2020 MSA). The 2020 MSA identifies Uber Brasil as “a limited liability company incorporated in accordance with Brazilian laws . . . and its Affiliates.”[3] The 2020 MSA provides that it “contain[s] the full and complete understanding and
 
--------------------------------------------
 
[2] It provides: “This Agreement will be governed and construed in accordance with the laws of Brazil and Parties elect the central of [sic] court of São Paolo to settle any dispute arising of [sic] this Agreement. This Agreement is the complete and exclusive statement regarding the subject matter of this Agreement and supersedes all prior agreements, understandings and communications, oral or written, between the parties regarding the subject matter of this Agreement.”
[3] “Affiliate” is defined as “with respect to any entity, any other entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such entity[.]”
 
                                                            -4-
 
agreement between the parties relating to the subject matter hereof and supersede[s] all prior and contemporaneous understandings and agreements, whether oral or written, relating [to] such subject matter hereof.”
            Like the 2019 MSA, the 2020 MSA states that Grip will perform services as described in an SOW. It also contains a provision providing that neither party will use or disclose confidential information other than in the course of performing services under the agreement. The 2020 MSA contains a choice of law and forum selection provision – albeit with wording slightly different from the 2019 MSA. It provides “[t]his Agreement shall be governed by and construed in accordance with Brazilian laws without regard to its choice or conflict of laws provisions” and Grip “consents to exclusive jurisdiction and venue in the state courts sitting in the city of São Paolo, state of São Paulo, Brazil.”
            The corresponding 2020 SOW, Exhibit A to the 2020 MSA, was entered into between Grip and Uber Brasil – without reference to any Uber Brasil affiliate. The 2020 SOW does not contain a choice of law or forum selection clause but provides that it is governed by the 2020 MSA. Both the 2020 MSA and SOW contain provisions preventing the unauthorized disclosure and use of confidential information.
            In connection with the 2020 MSA, Uber and Grip entered into a separate Uber Processing Agreement (Processing Agreement), Exhibit B to the 2020 MSA, that governs Grip’s processing and use of Uber’s “Personal data” in connection with the pilot program. The Processing Agreement provides that “[t]he applicable law and jurisdiction as set forth in the Main Agreement [MSA] apply to this Agreement.”
            The second Pilot began in March 2021 using an enhanced version of Grip’s “Sentinel” app, which included automatic recording and other core features of Grip’s technology that Grip had designed and developed before the second pilot and that Grip
 
                                                            -6-
 
had demonstrated to Uber in April 2020.
            During the two pilots, Grip was responsible for developing, researching, testing, deploying, and troubleshooting the Sentinel app and shared information with Uber including shared drives and documents. During their communications, Grip provided Uber with confidential information and know-how crucial to the successful implementation of audio / video capture. It did so in furtherance of its business relationship and pursuant to the 2019 and 2020 agreements. At least some of the confidential information was sent from Grip’s computer systems in Massachusetts. Uber downloaded Grip’s confidential information onto its servers, hard drives, and flash drives, and printed or otherwise made physical copies of the information. Grip retained its rights and interest in its intellectual property and confidential information.
            During the pilot programs, the parties recorded 3.4 million hours’ worth of rides. Uber Brasil’s senior leadership expressed their view of the importance of the partnership and, in mid-August 2021, renewed its license for additional recorded audio- video hours. Users also expressed positive feedback with more than half of drivers reporting that the app would cause them to drive more with Uber and over seventeen percent of riders indicating they would pay more for a trip in a car with Grip’s technology.
            Uber Kids. During the Brazilian pilot program, Grip also provided Uber with confidential information related to Grip’s safety solution for unaccompanied minors using rideshare cars. Specifically, in February 2020, Grip met with Uber personnel to discuss an Uber Kids project and Grip gave Uber its confidential, technical information about encryption and audio-visual encodings and broadcasting including technical information regarding a number of proprietary capabilities.
 
                                                            -7-
 
            End of the Relationship. In August 2021, the parties discussed a long-term relationship including the possibility of Uber permanently licensing or acquiring Grip’s technology. Uber asked Grip to provide proposals including for the acquisition of Grip. After Grip provided a proposal for a license expansion for Latin and North America in September 2021, Uber personnel asked to review Grip’s confidential documents relating to the Sentinel app and pilot metrics. One of the documents detailed all available options to reduce the risk of app crashes, and another contained confidential statistics about the pilot programs. Both were stored on accounts controlled by Grip in Massachusetts. Uber again asked for additional confidential technical information in October 2021. In November 2021, Grip answered Uber’s questions and later provided additional technical information including regarding Grip’s enhanced nighttime visibility. Later in 2021, at Uber’s request, Grip tested its nighttime functionality and shared those results with Uber.
            On December 1, 2021, Uber informed Grip that Uber would be moving forward with a hardware safety solution using dashcams instead of Grip’s technology. Uber reiterated to Grip throughout December 2021, that Uber would be using a dashcam program for driver and rider safety. To continue their partnership, Grip offered to create a bundled feature adding dashcam to its technology and reminded Uber that 83% of Uber drivers had reported they felt safer when they used Grip’s recording feature.
            Talks between the parties ended in May 2022. On May 18, 2022, Uber told Grip that Uber had terminated the Uber kids program. On May 23, 2022, an iOS developer intern at Uber accessed the pilot metrics Grip had provided to Uber during the pilot program.
 
                                                            -8-
 
            Alleged Trade Secret Misappropriation. In October 2022, Uber announced the launch of an in-ride video-recording function that did not involve dashcams, called the “Record My Ride” feature. The announcement explained that it would not use dashcams because they require extensive set up and are expensive. Uber claimed it had been working on the Record My Ride features for a few quarters, which overlapped with the period Grip was providing its confidential and proprietary information.
            The Record My Ride design is similar to Grip’s technology including a driver’s front-facing camera and video preview for drivers to view the recordings. Both also have automatic start / stop functionality beginning at pick-up and ending at drop off. Uber’s public statements about Record My Ride appear to reference information learned during the Brazil pilot programs with Grip. Uber initially launched the Record My Ride feature in Brazil. After conducting pilots in the United States, Uber rolled out its Record My Ride audiovisual recording feature in many major U.S. cities.
            In May 2023, Uber announced the launch of Uber for Teens which employs Grip’s proprietary capabilities, techniques, and process flows that Grip shared with Uber. Grip alleges, on information and belief, that Uber and Uber Brasil disseminated Grip’s trade secrets to the Record My Ride and Uber Teens development teams without Grip’s knowledge or consent. Grip also alleges on information and belief that Uber and or Uber Brasil reverse-engineered Grip’s APKs to obtain Grip’s source code, software design, and / or algorithms and used those improperly obtained trade secrets to create Record My Ride and Uber Teen.
DISCUSSION
I. Dismissal Based on the Forum Selection Clause
            Uber moves to dismiss arguing first that the mandatory forum selection clauses in the various agreements requires suit in Brazil. As explained below, I conclude that
 
                                                            -9-
 
while Uber is a third-party beneficiary of the 2020 MSA and that the forum selection clause therein is enforceable by Uber in that capacity, it is inapplicable to the noncontract claims asserted by Grip in this action. As such, dismissal based on the forum selection clause cannot be granted.
            A. Uber is a third-party beneficiary of the contracts.
            Grip argues that Uber cannot enforce the forum selection clause in the 2020 MSA because Uber was not a party to that contract. [4] Putting to the side the question of whether Uber was party to that agreement as Uber Brasil’s “Affiliate,” Uber can enforce the forum selection clause because Uber was a third-party beneficiary of the agreement.[5]
            “Massachusetts law recognizes ‘the right of an intended beneficiary of a contract to sue for its enforcement or breach.’” Brown v. Saint Vincent Radiological Assocs., Inc., 105 Mass. App. Ct. 1, 6 (2024), quoting James Family Charitable Found. v. State St. Bank & Trust Co., 80 Mass. App. Ct. 720, 723 (2011). See also Cumis Ins. Soc’y, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 466 (2009) (Massachusetts “incorporate[s] the provision on third-party beneficiaries set forth in Restatement (Second) of Contracts § 302 (1981)”), citing Miller v. Mooney, 431 Mass. 57, 62 (2000). To be considered such a
 
--------------------------------------------
 
[4] Although the entire scope of the relationship and contracts governing the Brazil pilot program is relevant, on this issue – the applicable forum selection clause – the forum selection clause in the 2020 MSA applies. That is because the 2020 MSA expressly states that it supersedes all prior written and or oral agreements between the parties.
[5] The 2020 MSA defines Uber Brasil to include its “Affiliates.” Although the Complaint does not explicitly identify Uber as Uber Brasil’s affiliate, the only reasonable inference is that it is, and Grip has not denied or argued that Uber is not affiliated with Uber Brasil. Rather, Grip argues that the term “Affiliates” in the 2020 MSA refers only to those Uber affiliates that may enter separate SOWs. Having concluded that Uber is an intended third-party beneficiary of the 2020 MSA, I need not address that issue.
 
                                                            -10-
 
beneficiary, “the ‘language and circumstances of the contract’ [must] show that the parties to the contract ‘clear[ly] and definite[ly]’ intended the beneficiary to benefit from the promised performance.” Cumis Ins. Soc’y, Inc., 455 Mass. at 466, quoting Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 366–367 (1997). See Markel Service Ins. Agency, Inc. v. Tifco, Inc., 403 Mass. 401, 405 (1988) (“the parties’ intent determines whether a third party is an incidental or intended beneficiary”); Spinner v. Nutt, 417 Mass. 549, 555 (1994) (“A party is an intended beneficiary where ‘the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance.’”), quoting Rae v. Air-Speed, Inc., 386 Mass. 187, 194 (1982).
            Here, the only rational reading of the Complaint, the relationship between the parties as detailed in the Complaint, and the governing contracts, is that Uber was the ultimate intended beneficiary of the entire Brazil pilot program with Grip.
            In its description of the 2020 MSA in the Complaint, Grip clearly indicates it considered Uber to be bound by the 2020 MSA and to be the real party in interest:
The Master Services Agreement and corresponding SOW . . . made clear that: . . . (3) Uber could not develop features similar to Grip’s technology if they violated Grip’s IP rights; and (4) Uber only had the right to use the Retained Rights during the term of the SOW.
Compl. ¶ 47 (emphasis added). Other allegations in the Complaint similarly make clear that Uber was the ultimate intended beneficiary of the pilot program:[6]
* “Uber . . . engaged Grip to evaluate, across two years of pilot programs and constant discussions, to assess Grip’s rideshare solution for Uber’s potential licensing or acquisition,” Compl. ¶ 7;
* “Uber’s two pilot program rollouts of Grip’s audiovisual-recording technology, deployed on rides in Brazil and supported by Grip and Uber engineers and executives in the United States, captured 3.4 million hours using Grip’s technology,” id. ¶ 8;
 
--------------------------------------------
 
[6] In the quotes that follow, all the emphasis is added.
 
                                                            -11-
 
* “Uber decided to test Grip’s technology via a pilot partnership,” id. ¶ 43;
* “Uber . . . invited [] Kayyem to participate in a public session for Uber’s global safety and security teams,” id. ¶ 45;
* “[t]he success of the first pilot led Grip and Uber to . . . agree to a second pilot in Brazil,” id. ¶ 47;
* during the pilot, “Grip and Uber employees had near daily communications . . . Grip from its offices in Cambridge, and Uber, from its offices in San Francisco and Brazil,” id. ¶ 49;
* “Grip provided Uber with confidential information and know-how” and “Uber and its subsidiaries were obligated” to keep the information confidential, id. ¶ 50; and
* “[a]t all times during its business relationship with Uber, Grip retained all rights, title and interest in” its intellectual property. Id. ¶ 52 
            Documents connected to the 2019 and 2020 MSAs are consistent with the Complaint’s allegation. The Executive Summary preceding the 2019 MSA states that the parties engaged in the pilot program to allow Uber to assess Grip’s technology and makes clear that the parties intended to engage in the pilot for Uber’s ultimate benefit.[7] Additionally, appended to the 2020 MSA is a separate Processing Agreement between Uber and Grip, which governed Grip’s processing and use of Uber’s “Personal data” in connection with the second pilot program and incorporated by reference the 2020 MSA and its “applicable law and jurisdiction.”
            Accordingly, Uber is an intended third-party beneficiary of the 2020 MSA and is permitted to enforce its terms, including the forum selection clause.
            Grip primarily relies on two cases to argue that Massachusetts does not allow Uber to enforce the forum selection clause. First, Ajemian v. Yahoo!, Inc., 83 Mass. App.
--------------------------------------------
 
 
[7] Grip alleges in the Complaint that, “[a]lthough Brazil was selected for logistical reasons, the parties understood that the potential business opportunity was not limited to Brazil.” Compl. ¶ 43.
 
                                                            -12-
 
Ct. 565, 577-578 (2013), in which the Court considered whether an online forum selection clause could be enforced against a nonsignatory to the contract.[8] Although the Appeals Court noted that it “found no Massachusetts case enforcing a forum selection clause or a limitations clause against a nonsignatory to the contract,” it recognized that “courts in other jurisdictions have generally accepted that nonsignatory third parties can be bound where the nonparty is sufficiently closely related to a signatory that it is foreseeable that the nonsignatory will be bound.” Id. at 577-578, citing BNY AIS Nominees Ltd. v. Quan, 609 F. Supp. 2d 269, 275 (D. Conn. 2009); Synthes, Inc. v. Emerge Medical, Inc., 887 F. Supp. 2d 598, 607 (E.D. Pa. 2012). Relying on that law, the Appeals Court stated that, “[o]ne situation where a non-party may invoke a contractual forum selection clause, or it can be invoked against the non-party, is where the non- party is a third-party beneficiary of the contract.” Id. at 578, quoting, BNY AIS Nominees Ltd., 609 F. Supp. 2d at 275. The Ajemian Court declined to apply the clause at issue, however, because it concluded the plaintiffs were not third party beneficiaries to the contract. Id.
            Grip also relies on Try Switch, Ltd. v. Endurance Int’l Grp., 83 Mass. App. Ct. 1131, 2013 WL 2096605, *1 (2013) (Rule 1:28 decision) in which a panel of the Appeals Court noted that it had “found no Massachusetts case permitting a nonparty to a contract to enforce a forum selection clause against a party to the contract.” However, like the Ajemian Court, the panel recognized that “courts in other jurisdictions have generally accepted that nonsignatory third parties can enforce a forum selection clause against a signatory . . . where the nonparty is a third-party beneficiary of the contract.” Id. Moreover, as in Ajemian, the panel did not enforce the forum selection clause
 
--------------------------------------------
 
[8] Of course, here, a third-party beneficiary of the contract seeks to enforce the forum selection clause against a party to the contract.
 
                                                            -13-
 
because it found “nothing in the contract, or elsewhere in the record, . . . indicate[d] that the parties to the contract had the defendant in mind in any way at the time the contract was drafted or entered into.” Id.
            Neither Ajemian nor Try Switch, Ltd. support Grip’s contention. In contrast to those cases, and as demonstrated above, there is ample evidence in the Complaint, the relationship between the parties, and several of the relevant contracts, to conclude that Grip and Uber Brasil intended Uber to be the ultimate beneficiary of the relationship, contracts, and pilot programs. See DiPietro on Behalf of Mari Holdings MD, LLC v. Fireman, 2021 WL 3493756, at *4 (Mass. Super. June 3, 2021) (recognizing that third party beneficiaries may be able to invoke a forum selection clause but holding that the plaintiff was not a party to nor an intended beneficiary of the contract at issue).
            B. The forum selection clause is enforceable.
            For thirty years, the law in the Commonwealth has been that “forum selection clauses are to be enforced if it is fair and reasonable to do so.” Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 574–575 (1995), citing Restatement (Second) of Conflict of Laws § 80 (1988 revision) (“The parties’ agreement as to the place of the action will be given effect unless it is unfair or unreasonable”). Unfairness or unreasonableness may be found where the forum selection clause resulted from “fraud, duress, the abuse of economic power or other unconscionable means.” Id. at 575 n.5, quoting Restatement (Second) of Conflict of Laws § 80 comment c (1971 & rev. 1989). This also may be found if “the party who seeks to escape the consequences of the clause [shows] that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court.” Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics, 433 Mass. 122, 130 (2000) (quotations omitted).
 
                                                            -14-
 
            Grip bears the burden of demonstrating that enforcement is unfair or unreasonable in the circumstances.  Melia v. Zenhire, Inc., 462 Mass. 164, 182 (2012). But Grip does not argue fraud, duress, abuse of economic power, or that trial in Brazil will be so difficult or inconvenient that it would be deprived of its rights if it was forced to litigate in Brazil. Accordingly, the provision is enforceable on its terms.  Brazilian law is not to the contrary.[9]
            C. Although enforceable, the forum selection clause applies only to contract- based claims.
            Grip’s final argument, that the forum selection clause is limited and applies only to contract-based claims, fares better and persuades me. To determine the scope of the forum selection clause, I examine its language. Carter’s of New Bedford, Inc. v. Nike, Inc., 790 F.3d 289, 293 (1st Cir. 2015) (“[I]t is the language of the forum selection clause itself that determines which claims fall within its scope.”), quoting Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 19 (1st Cir. 2009). After careful review, I conclude that the forum selection clause in the 2020 MSA requires only that contract-based claims be brought in Brazil.
 
--------------------------------------------
 
[9] Uber has provided an affidavit of Felipe de Melo Fonte, an adjunct professor at Fundação Getulio Vargas in Rio de Janeiro, Brazil. Grip has not challenged Professor Fonte’s qualifications as an expert in Brazilian law. Relevant here, Professor Fonte states: (I) forum selection clauses are valid and enforceable in courts in Brazil; (ii) the clauses must be in writing and “concern a particular subject matter”; (iii) forum selection clauses will not be enforced where the contract is one of adhesion and the clause hinders access to the courts or where “there are strong factual circumstances indicating intellectual or economic vulnerability of the parties”; and (iv) the party resisting a forum selection clause bears the burden of proof. The remainder of the affidavit addresses Grip’s ability to obtain fair and impartial redress in the Brazilian courts for the claims asserted in this case.
 
                                                            -15-
 
            Section 11.2 states: “This Agreement shall be governed by and construed in accordance with Brazilian laws without regard to its choice or conflict of laws provisions. [Grip] hereby consents to exclusive jurisdiction and venue in the state courts sitting in” São Paolo, Brazil. The second sentence does not identify the nature of the disputes subject to that exclusive jurisdiction. But because it follows the sentence that provides that the Agreement would be governed by Brazilian law, I conclude that Grip consented to the exclusive jurisdiction of the courts in São Paolo, Brazil for the resolution of claims that “have their inception” in the 2020 MSA and not claims or disputes that precede the contract, merely relate to the 2020 MSA, or stem more generally from the relationship of the parties. Chebotnikov v. LimoLink, Inc., 150 F. Supp. 3d 128, 131 (D. Mass. 2015) (restricting clause to “disputes that are sourced in the terms of the agreement”). See also Jacobson, 419 Mass. at 578 (“forum selection clause by its terms relates only to actions to enforce the agreement and not to actions based on unlawful conduct that induced a franchisee to sign the agreement”); Donovan v. Rhodes, 2018 WL 3096669, at *2 (Mass. Super. Mar. 6, 2018) (forum selection clause limited in scope because it did not “include language that extends the agreement to any disputes relating to the [contract] or other similarly broad language frequently contained in forum selection clauses that might capture matters not specifically involving the rights and obligations expressly arising out of the contract”); cf. Baby Furniture Warehouse Store, Inc. v. Meubles D & F Ltée, 75 Mass. App. Ct. 27, 30 (2009) (forum selection clause governed non contract claims because it covered “any disputes arising out of or related to this [contract] or the relationship between” the parties) (emphasis added).
            That conclusion is bolstered by my determination, discussed above, that Uber was an intended third-party beneficiary of the 2020 MSA and that the entire
 
                                                            -16-
 
relationship – spanning several different contracts and two pilot programs – was intended ultimately for Uber’s benefit. It was logical for the parties to agree that contractual disputes about the Brazilian pilot programs and the various agreements governing the programs would be resolved in Brazil – where the pilots occurred. It would not be logical to conclude that Grip and Uber, both of which are American companies and both of which contemplated a much broader relationship, would agree that all of their disputes related to all of the shared information and technology and their entire relationship would be resolved in Brazil.[10] See Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 188 (2016) (“[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties”), quoting Starr v. Fordham, 420 Mass. 178, 192 (1995).
            To avoid that conclusion, Uber makes two arguments. First, it contends that the last sentence in Section 11.2 broadens the scope of the forum selection clause. That sentence reads, “[i]f any dispute between the parties arises out of any matter governed by this Agreement, each party will first attempt in good faith to reach a settlement through negotiation by its appointed representative.” I do not read this voluntary negotiation provision as broadening the scope of the forum selection clause. And, even if the “any matter governed by the Agreement” language were applicable, it would not encompass Grip’s noncontract claims asserted here.
            Second, Uber argues that, even if the forum selection clause in the 2020 MSA is inapplicable to the claims here, Section 10 of the 2020 NDA, which provides the parties “elect the central of [sic] court São Paolo to settle any dispute arising of [sic] this Agreement,” is applicable. That argument ignores that the 2020 MSA expressly
 
--------------------------------------------
 
[10] Indeed, the very first agreement between Uber and Grip called for the application of California law.
 
                                                            -17-
 
supersedes all prior agreements between the parties. And, even if I were to consider the 2020 NDA, its language also is not broad enough to encompass the noncontract claims here.
            In sum and substance, Grip essentially alleges that the entire project was a ruse: Uber falsely expressed interest in licensing or acquiring Grip’s technology, and wrongfully enticed Grip to participate in the Brazilian pilot program while intending to steal or reverse engineer Grip’s technology. None of Grip’s claims, therefore, are barred by the forum selection clause.
II. Dismissal for Failure to State a Claim
            In evaluating an motion brought under Mass. R. Civ. P. 12(b)(6), I “look beyond the conclusory allegations in the complaint,” Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded “factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief.” Iannacchino, 451 Mass. at 636 (quotations omitted).  In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true “such inferences as may be drawn [from those facts] in the plaintiff’s favor.” Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I conclude that all but a portion of Grip’s fraud and negligent misrepresentation claims survive.
            A. MUTSA Claim
            Uber argues first that Grip did not plausibly plead trade secret misappropriation because it did not identify its alleged trade secrets and basis for protection with sufficient particularity. Uber relies on language in the MUTSA that, to bring an action, “a party must state with reasonable particularity the nature of the trade secrets and the basis for their protection.” G. L. c. 93, § 42D(b) (emphasis added). That mandate
 
                                                            -18-
 
however, requires only sufficient allegations to permit the defendant to understand what information is alleged to have been misappropriated, how it was appropriated, and the basis of the plaintiff’s assertion that the information constitutes a trade secret. See Milliman, Inc. v. Gradient A.I. Corp., No. CV 21-10865-NMG, 2022 WL 18032957, at *2 (D. Mass. July 11, 2022) (“the statute sets forth a less onerous obligation at the pleading stage that focuses on describing the misappropriation with particularity and the trade secrets in more general terms”). Grip has done so here.
            MUTSA defines a trade secret as “specified or specifiable information . . . including but not limited to a formula, pattern, compilation, program, device, method, technique, process, business strategy, customer list, invention, or scientific, technical, financial or customer data” that “provided economic advantage” from not being generally known or ascertainable and that was the subject of reasonable efforts “to protect against it being acquired, disclosed or used without the consent of the person properly asserting rights therein.” G. L. c. 93, § 42(4). Here, Grip has identified specific proprietary information provided to Uber, including the dates and recipients of said information, that the information provided economic advantage, and that Grip took reasonable steps to insure its secrecy.
            For example, Grip has alleged the provision of the following: technical information stemming from its testing and analysis of its technologies; details about the operability of Grip’s technology and the configurable video parameters Grip developed for it, including optimal data rate ranges for video uploading / streaming; confidential “know-how” related to Grip’s Sentintel app; confidential documents including its “Sentinel Improvement Options” and “Sentinel Daily Usage Report”; confidential information focused on video recording configurations and nighttime visibility functions; and confidential Software Development Kit documentation referencing
 
                                                            -19-
 
technical information about Grip’s audiovisual-capture solution. Grip has also alleged that it took reasonable measures to protect the confidential and proprietary information provided to Uber, acquired its trade secrets through years of costly research and development, and the information and know-how provides actual and potential economic advantage from not being known or readily ascertainable. These allegations are sufficient and the cases Uber relies upon do not persuade me elsewise.[11]
B. Preemption
            Uber argues next that, if the MUTSA claim proceeds, Grip’s other claims are preempted and must be dismissed. I disagree.
            Uber relies on the following section in the MUTSA:
Except as provided in subsection (b), sections 42 to 42G, inclusive, shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret.
G. L. c. 93, § 42F(a). That provision is immediately tempered by subsection (b) which provides that MUTSA does not affect “other civil remedies to the extent that they are not based upon misappropriation of a trade secret[.]” Id. § 42F(b)(3).
            Two cases in the Commonwealth, albeit from the United States District Court, have considered this question and concluded that the MUTSA does not preempt state law claims that rely upon the alleged theft of confidential information. See Neural Magic, Inc. v. Facebook, Inc., 2020 WL 13538627, at *3 (D. Mass. Oct. 29, 2020)
 
--------------------------------------------
 
[11] Certainly, once discovery commences, the Court will order the production of a trade secret list, together with and Order to protect the trade secrets at issue. See G. L. c. 93, § 42D (“Before commencing discovery relating to an alleged trade secret, the party alleging misappropriation shall identify the trade secret with sufficient particularity under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense.”).
 
                                                            -20-
 
(hereinafter, Neural Magic); KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, 729 F. Supp. 3d 84, 119-120 (D. Mass. 2024). I agree with the reasoning and logic of the Court’s discussion in Neural Magic.
            The Court in Neural Magic noted the absence of “Massachusetts legislative history to suggest that the legislature intended” wholesale preemption when it adopted the MUTSA. 2020 WL 13538627, at *3.[12] The Court also noted that, the language of the “preemption” provision is, by its terms, limited to “conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret” and that the MUTSA “is silent about uniformity with respect to confidential information that may not constitute a trade secret[.]” Id. at *1, *3. Given these observations and that the MUTSA contains an explicit definition of a trade secret, I agree with the Court that MUTSA preemption does not apply to state law claims that rely upon the alleged theft of confidential information that does not rise to or constitute a trade secret. Id. at *3, citing Brand Servs., L.L.C. v. Irex Corp., 909 F.3d 151, 158 (5th Cir. 2018) (“if confidential information that is not a trade secret is nonetheless stolen and used to the unjust benefit of the thief or detriment of the victim, then a cause of action remains under Louisiana law”).
            Additionally, like the Court in Neural Magic, I agree with the reasoning expressed in Cenveo Corp. v. Slater, 2007 WL 527720, at *3 (E.D. Penn. Feb. 12, 2007), that finding preemption would be premature at the motion to dismiss stage of a proceeding where “it has yet to be determined whether the information at issue constitutes a trade secret[.]”
 
--------------------------------------------
 
[12] Uber directs me to no evidence of the necessary clear legislative intent to find preemption. See Roma, III, Ltd. v. Board of Appeals of Rockport, 478 Mass. 580, 588 (2018); Ajemian, 478 Mass. at 178.
 
                                                            -21-
 
            With regard to Grip’s unjust enrichment and conversion claims, if Grip has no remedy under the MUTSA for trade secret misappropriation because the information, although belonging to Grip does not constitute a trade secret, Grip may have a remedy under those claims. See Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (“Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience” and the “equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law”) (quotations omitted); Weiler v. PortfolioScope, Inc., 469 Mass. 75, 87 (2014), quoting Third Nat’l Bank of Hampden Cnty. v. Continental Ins. Co., 388 Mass. 240, 244 (1983) (Conversion requires proof that the defendant wrongfully exercised “dominion or control” over the plaintiff’s property). See also In re Hilson, 448 Mass. 603, 613 (2007) (“Modern rules of pleading permit alternative pleading.”), citing Mass. R. Civ. P. 8(e)(2). Thus, I cannot dismiss those claims based on preemption.
            As to the fraud and negligent misrepresentation claims, I disagree that the MUTSA has any preclusive effect as those claims ultimately concern misrepresentations not misappropriation. Thus, the preemption argument likewise fails in connection with the claims.
            Lastly, the preemption argument fails in connection with the G. L. c. 93A claim because the claim is broader than mere misappropriation. Grip alleges that Uber’s entire course of dealing was a ruse and that Uber never intended to partner with Grip but engaged in the Brazilian pilot programs solely to get access to Grip’s technology and expertise.
 
                                                            -22-
 
            C. Remaining Claims
                        1. Unjust Enrichment
            In connection with the claim of unjust enrichment, Uber argues that it fails because valid contracts define the rights of the parties and Grip has an adequate remedy at law – presumably under the MUTSA.  That may be.  But, as noted, parties can plead claims in the alternative, which Grip has done here. And “[a] determination of unjust enrichment is one in which ‘[c]onsiderations of equity and morality play a large part.’” Metro. Life Ins. Co. v. Cotter, 464 Mass. 623, 644 (2013), quoting Salamon v. Terra, 394 Mass. 857, 859 (1985).
                        2. Fraud and Negligent Misrepresentation
            Grip’s misrepresentation claims stem from (I) the alleged false assertion at the outset of their relationship that Uber was interested in Grip’s technological solution and (ii) Uber’s alleged false statements at the end of the relationship about its plans to use dashcams instead of Grip’s technology. To survive dismissal of those claims, Grip must allege facts plausibly suggesting that Uber Defendants made false representations of fact, Grip reasonably relied on those representations, and Grip was harmed as a result. Equipment & Sys. For Indus., Inc. v. Northmeadows Const. Co., Inc., 59 Mass. App. Ct. 931, 931 (2003) (describing elements of fraud); Gossels v. Fleet Nat. Bank, 453 Mass. 366, 371–372 (2009) (describing elements of negligent misrepresentation). Further, fraud must be pled with particularity. See Mass. R. Civ. P. 9(b) (“In all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity.”).
            Grip’s first theory is that Uber falsely misrepresented its interest in Grip’s technology “to induce Grip to provide Uber with the know-how necessary to enable Uber to create its own copy-cat solution.” The problem with that theory is that there are no averments in the Complaint regarding specific statements that were false when
 
                                                            -23-
 
made and on which Grip relied.  Certainly, the Complaint is replete with averments that Uber made requests for specific information and that Grip complied. But those requests were made in the context of an ongoing contractual relationship. That the relationship soured and Uber allegedly used the confidential and proprietary information Grip provided to come up with a competing product, does not state a claim for fraud or negligent misrepresentation. Grip nowhere alleges that anyone at Uber promised anything about a future relationship and, even if someone did, statements about the future are generally not actionable as fraud unless they were not true when made. See Hogan v. Riemer, 35 Mass. App. Ct. 360, 365 (1993) (“Statements of expectation, such as, ‘We'll work with you,’ do not support an action for common law fraud.”). Moreover, Grip does not plausibly allege that all Uber’s requests for information, in the context of the Brazil pilot programs, were false when made. See Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co., 53 F. Supp. 3d 279, 300 (D. Mass. 2014) (“a statement expressing a projection or opinion may give rise to liability if it is ‘not reasonably based on, or [is] inconsistent with, the facts at the time the forecast is made’”), quoting Glassman v. Computervision, 90 F. 3d 617, 627 (1st Cir. 1996).
            Grip’s second theory of fraud is that Uber lied about the reasons it was not going to continue its relationship with Grip, namely, that Uber would be moving forward with a hardware safety solution using dashcams. With respect to this assertion, Grip alleges it was false when made and that it relied on that allegedly false statement about Uber’s choice to use dashcams by “ceasing to market its solutions to Uber and other potential partners and by slowing down its business.” Although Uber’s argument that any detrimental reliance on Uber’s dashcams statements resulting in Grip’s slowdown of its own products was not reasonable has some inherent appeal, I cannot conclude
 
                                                            -24-
 
that the reliance alleged was not reasonable as a matter of law applying the Rule 12(b)(6) standard. See Fraelick v. PerkettPR, Inc., 83 Mass. App. Ct. 698, 709 (2013) (“Whether the plaintiff did actually rely on [the] promises, and whether her reliance ultimately was reasonable, are of course fact questions that may not be resolved on a motion to dismiss”); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59-60 (2004) (reasonableness of reliance is best assessed at later stages of litigation after factual record has been established).
            Accordingly, the misrepresentation claims premised on the alleged false plan to use Grip’s technology fail but the claims related to Uber’s false statement of its intention to use dashcams survives.
                        3. G. L. c. 93A
            Uber argues that the G. L. c. 93A claim fails because it is based on the flawed trade secret misappropriation and fraud claims. As those claims survive dismissal for the reasons stated above, that argument is now moot. Further, based on my review of the Complaint and the fair inferences I draw therefrom in Grip’s favor, the G. L. c. 93A claim is not wholly derivative. Grip alleges that Uber’s entire course of dealing was a ruse and that Uber never intended to partner with Grip but engaged in the Brazilian pilot programs solely to get access to Grip’s technology and expertise. If proved, those allegations state a claim for relief under G. L. c. 93A. See Travis v. McDonald, 397 Mass. 230, 232 (1986) (stating that “c. 93A establishes a new cause of action for unfair and deceptive trade practices, neither wholly tortious nor wholly contractual in nature” and “c. 93A claims are sui generis, and involve new substantive rights not subject to the traditional limitations of pre-existing causes of action”) (quotations omitted).
            Uber argues as well that the c. 93A claim fails the locus of conduct requirement. G. L. c. 93A, § 11 provides that “[n]o action shall be brought or maintained under this
 
                                                            -25-
 
section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.” Uber bears the burden of proof of establishing that “such transactions and actions did not occur primarily and substantially within the commonwealth.” Id.
            The Supreme Judicial Court (SJC) has said that, whether the conduct underlying a c. 93A claim occurred primarily and substantially in the Commonwealth is, ordinarily, “not a determination that can be reduced to any precise formula” and that “[a]ny determination necessarily will be fact intensive and unique to each case.” Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 472–473 (2003). I agree with Grip that this argument is not yet ripe for resolution, particularly where the Complaint states that the alleged trade secrets were maintained in Massachusetts and sent from Massachusetts to Uber and that Uber’s alleged copy-cat technology is being used in the Commonwealth. See Resolute Mgmt. Inc. v. Transatlantic Reinsurance Co., 87 Mass. App. Ct. 296, 300 (2015) (“§ 11 appears to contemplate that [the locus of conduct] assessment would occur following, and based upon, findings of fact made by a judge. . . . [W]e find it difficult to imagine how such an assessment might be made on the basis of the allegations of the complaint alone[.]”) (citations, quotations, and alterations omitted); Steward Health Care Sys., LLC v. Aya Healthcare, Inc., No. 2184CV513BLS2, 2021 WL 4048637, at *3 (Mass. Super. July 27, 2021).
                        4. Conversion
            Finally, with respect to the claim of conversion, Uber asserts that there can be no conversion because Grip still has access to its own trade secrets and confidential information. In other words, even if the technology and information at issue was stolen
 
                                                            -26-
 
by Uber and used by Uber to create its own audiovisual safety solutions, because Uber has not prevented Grip from accessing that information, there can be no conversion.
            Uber relies on In re Hilson in which the SJC stated that “[t]he elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment.” 448 Mass. at 611 (emphasis added). I am not persuaded. The property at issue in In re Hilson was money, and the Court followed the statement on which Uber relies with the caution that conversion does not include a “requirement that the one converting property be shown to have had the intent to deprive permanently the rightful owner of its use and enjoyment, as in stealing.” Id. Moreover, I am persuaded by Genis v. Campbell in which Judge Salinger explained that “[c]onversion can be proved by showing either the wrongful acquisition of property or a refusal to return it when asked” and indicated that the wrongful retention of a party’s confidential information constitutes conversion. 2019 WL 1430152, at *3 (Mass. Super. Feb. 26, 2019) (emphases added), citing Waxman v. Waxman, 84 Mass. App .Ct. 314, 321 (2013).[13] That conclusion makes ample sense when the stolen property is provided in the course of an ostensible business relationship and not returned but improperly used for the recipient’s own benefit. Grip has adequately pled conversion which, like unjust enrichment, can be pleaded alternatively to a claim at law.
--------------------------------------------
 
[13] The other two cases on which Uber relies are not persuasive. The first is inapposite. See Tutor Perini Corp. v. Banc of Am. Sec. LLC, 2013 WL 5376023, at *27 (D. Mass. Sept. 24, 2013). The second reaffirms that there are two ways to establish conversion. Novi Footwear Int’l Co. Ltd. v. Earth OpCo LLC, 2022 WL 16640729, at *3 (D. Mass. Nov. 2, 2022) (complaint must allege “that the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property”) (emphasis added), quoting Grande v. PFL Life Ins. Co., 2000 WL 1476676, at *4 (Mass. App. Div. Sept. 27, 2000).
 
                                                            -27-
 
ORDER
            For the foregoing reasons, Uber’s Motion to Dismiss is ALLOWED-in-part as to Grips claims of fraud and negligent misrepresentation premised on the wrongful inducement to enter the Brazilian pilot program partnership. Uber’s Motion to Dismiss is otherwise DENIED.